ESSROC CEMENT CORP., a Pennsylvania corporation, f/k/a Essroc Materials, Inc., Plaintiff,

v.

CPRIN, INC., a Michigan corporation, d/b/a CPR Indiana, Inc.; CP Recycling, Inc., a Michigan corporation; Defendant.

Case No. 1:08–CV–974.

United States District Court, W.D. Michigan, Southern Division.

Nov. 3, 2008.

Lawrence V. Stawiarski, Jessica B. Allmand, McDonald Hopkins PLC, Bloomfield Hills, MI, for Plaintiff.

Jonathan Edward Moore, Rodrick W. Lewis, Warner Norcross & Judd LLP, Grand Rapids, MI, for Defendants.

*Opinion and Order*

PAUL L. MALONEY, Chief Judge.

**Denying the Plaintiff's Application for a Temporary Restraining Order and Preliminary Injunction**

This is a diversity breach-of-contract and tort action. Plaintiff Essroc Cement Corporation formerly known as Essroc Materials, Inc. ("Essroc") filed the complaint on Friday, October 17, 2008 against CPR Indiana, Inc., which does business as CPRIN, and CP Recycling Inc. (collectively "CP" because they are allegedly one entity in practice), Paul Knowlson ("Knowlson", the owner of both companies), and Carol Knowlson, whose relationship to the CP companies and Paul Knowlson is not specified. *See* Complaint filed Oct. 17, 2008 ("Comp") ¶¶ 1–6 and 14. Essroc applied for a temporary restraining order ("TRO") and a preliminary injunction ("PI") on Tuesday, October 28, 2008,

and the defendants jointly filed a brief in opposition to the TRO on Wednesday, October 29, 2008.

The court has determined that the oral argument is not necessary. For the reasons that follow, the court will deny Essroc's application for a TRO and PI.

## BACKGROUND

Essroc receives liquid waste-derived fuels ("LWDFs") and used them for "ancillary / energy recovery" at its plant in Logansport, Indiana. Comp ¶ 11. From January 1997 through December 1999, Essroc had a written LWDF Services and Supply Contract with CP and Knowlson. Comp ¶ 9 and Exhibit ("Ex") A (expired 1997–1999 LWDF Services Contract). After the contract expired on December 31, 1999, the parties continued their business relationship. Comp ¶ 11. Both under the 1997–1999 contract and thereafter, CP handled Essroc's sales, customer support, billing and collection of receivables for "tipping fees" owed by Essroc's customers; in return, Essroc paid CP a monthly fee of $58,200. Comp ¶¶ 11–12. Each month, CP sent Essroc a statement listing the monthly gross revenue (including tipping fees), credits issued, the volume of LWDF received and burned, and the net revenue belonging to Essroc after the deduction of CP's monthly fee. Comp ¶ 13 and Ex B (January 10, 2008 letter).

In late 2007, Essroc determined that market conditions—namely, a reduction in regional demand for cement—required it to reduce operations at the Logansport plant from two kilns to one kiln effective January 1, 2008. Essroc advised CP of this reduction and asked to reduce CP's monthly fee accordingly, but CP refused. Comp ¶¶ 15–17. On February 14 or 15, 2008, Essroc notified CP and Knowlson that it was terminating the (unwritten) LWDF Services Agreement immediately

and taking over the sales, support, billing and collection services internally. Comp ¶ 18 and Ex C (Accounts Receivable Aging Schedule and February 2008 billing statement) and Ex E (letter stating that termination date was February 15, 2008 contrary to complaint's stated termination date of February 14, 2008). On February 10, 2008, CP issued its final monthly statement identifying monthly net receivables owed to Essroc of $418,823.76. Comp ¶ 19.

Essroc has made numerous written demands that CP turn over the $418,823.76 in February 2008 net receivables, but CP has failed and refused to pay. Comp ¶¶ 20–21 and Ex D (March 10, 2008 letter from Essroc counsel John N. Metzger, Esq. to CP counsel Paul R. Jackson, Esq.). CP contends that it is withholding that amount as damages for what it believes was Essroc's wrongful termination of the LWDF Services Agreement, but it states that the funds are being held in its counsel's client trust fund account. Comp ¶¶ 22–23 and Ex E (Feb. 26, 2008 letter of CP counsel Paul R. Jackson, Esq. to Essroc).

Essroc claims that by withholding the $418,823.76, CP and Knowlson have breached the agreement established by the parties' course of dealings, Comp ¶¶ 24–30; that CP and Knowlson have converted the February 2008 monthly net revenues to their own use and benefit without Essroc's permission, Comp ¶¶ 31–36; and that CP and Knowlson have willfully embezzled Essroc's "assets, including monthly net revenues", Comp ¶¶ 37–39. In count four, the complaint alleges that Carol Knowlson had actual or constructive knowledge that CP and Knowlson were not entitled to retention of Essroc's February 2008 monthly net revenues and "[i]n effectuating the remittance and usage by [CP and Knowlson], AND IN FAILING TO ADVISE Essroc of the attempted and/or ef-

fectuated transfers, [Carol] Knowlson knowingly aided in the concealment of stolen and/or embezzled property." Comp ¶¶ 40–45. In count five, Essroc claims that all four defendants engaged in a civil conspiracy in violation of Michigan common law. Comp ¶¶ 47–51.

Invoking Mich. Comp. Laws § 600.2919a(1)(a) and (b), Essroc seeks treble damages on the claims for conversion, embezzlement, and aiding in concealment of stolen/embezzled property, for a total (before interest, fees, and costs) of $1,256,471.20. *See* Comp ¶¶ 36, 39 and 46.

## THE PARTIES' POSITIONS

The defendants' version of events and legal position is stated in a February 26, 2008 letter from the defendants' counsel to Essroc:

> On February 15, 2008, Essroc employees summarily, and without notice, prevented CP employees and contractors from performing any further services under the Agreement and informed them that the Agreement was terminated and that they were to leave.
>
> Section 2 of the Agreement provides:
>
> > The term of this Agreement ("the Term") shall be for three (3) years commencing on January 1, 1994. It shall be automatically extended for an additional one (1) year period provided that Essroc receives at least Eight Million Five Hundred Thousand Dollars ($8,500,000) from the Gross Receipts collected by CP for the calendar year 1994.
> >
> > Except as provided in the preceding sentence, this Agreement shall also be automatically renewed for additional one (1) year periods ("Renewal Terms") unless either party at least ninety (90) days prior to the expiration of the Term or any Renewal Terms shall notify the other in writing

> that it wishes to terminate this Agreement. Following any such termination notice the parties shall use their best efforts to provide a smooth transfer to the successor HWDF supplier.
>
> Because the Agreement is year-to-year and terminable only upon 90 days' written notice prior to the end of any particular year, Essroc's termination was in breach of the breach of the Agreement, which breach has caused our client significant damages. *Pending quantification of these damages and discussing this matter with you, CP Recycling will be escrowing all Gross Receipts collected by it, less the commission and expenses provided by the Agreement, with this law firm.*

TRO Br, Ex F at 2–3 (second paragraph break added) (emphasis added).

In a June 16, 2008 letter to Essroc, defendant CP's counsel stated as follows:

> We are in the process of winding up the affairs of CPRIN, Inc. We anticipate that the Corporation will be dissolved sometime later this summer. CPRIN had only one line of business and, as you know, that ended in February of this year. I am looking at the accountant's preliminary balance sheet for the period ending June 30, 2008, which he has asked me not to share until he has had a chance to completely confirm all numbers. It will, of course, be available to you at that time.
>
> However, I can say that the Corporation is, as it has been all this year, insolvent. It shows assets on its books totaling about $31,000 of which about $19,000 is in cash, $10,000 in receivables, and $2,000 in net property and equipment (in your client's possession). Liabilities total approximately $406,000, including trade accounts payable totaling $265,000

and notes payable to prior shareholders totaling about $140,000. Not included in the balance sheet, at the present time, is CPRIN's [contemplated] claim against Essroc for breach of contract.

If the theory of wrongful termination of an annually renewable contract between our clients would be upheld it would mean, I believe, that CPRIN could claim damages in the amount of $643,500 ($58,500 per month × 11 months). That is presently not on the balance sheet. We are in the process of settling up with CPRIN's principal creditors: CP Recycling; Victor Potts; and Pat Jarrett. We will also have to deal with the other trade accounts creditors which, on June 30, were owed approximately $129,000. Your client has in its possession certain equipment that is the property of CPRIN, among which is certain software developed by our client. Our proposal to you is that CPRIN will transfer to Essroc all of its right, title and interest in and to the software in exchange for delivery of possession of the tangible property. With this mutual consideration, there would be a mutual release of all claims.

Please review this situation and get back to me at your earliest convenience. I would like to clean up this matter with Essroc by the end of June so that I can begin dealing with the other creditors. I would rather settle out our mutual claims against each other prior to doing that. In the meantime, if you have any questions or comments, please do not hesitate to give me a call.

Essroc's Opening Brief in Support of Application for Temporary Restraining Order "(TRO Br")" at 4 ¶ 21 and Ex F (Letter of Defense counsel Paul R. Jackson, Esq. to Essroc's counsel) at 4–5.

Essroc alleges that since the June 16, 2008 letter, CP's counsel has not communicated further regarding the status of the escrowed funds. TRO Br at 4 ¶ 22. Essroc's TRO brief does not specify whether Essroc's counsel contacted CP's counsel in response to CP's letter of June 16, 2008.

Essroc argues that "because Defendants have threatened to dissolve their business operations, or because the threat remains that Defendants may wrongfully divert or move the funds, Essroc is seeking to freeze the funds" which CP states are in its counsel's client trust account. Essroc reasons that issuing a TRO and PI will not substantially injure the defendants because they have already acknowledged that the funds will remain escrowed in counsel's client trust account until a court determines the rightful owner of the funds. TRO Br at 5 ¶¶ 23–24.

In addition to opposing preliminary injunctive relief, CP disputes two of the premises on which Essroc relies in its TRO brief. First, as a factual matter, CP states that Essroc is mistaken in its belief that CP has escrowed *any* funds in defense counsel's trust account in relation to this dispute:

The clear meaning of [defense counsel]'s [February 26, 2008] letter was that no funds had been escrowed and that none would be until, at a minimum, further discussions were had with Essroc and a quantification made of Defendants' damages. And despite some further discussions with Essroc, the fact is that the required quantification has not yet been made. Indeed, quantification of Defendants' damages will not be completed until resolution by this Court of counterclaims that Defendants will be asserting in this case.

Defendants' Brief in Opposition to Motion for TRO or PI ("CP's Opp") at 2; *see also* CP's Opp, Ex A, Affidavit of Paul R. Jackson, Esq. dated Oct. 29, 2008 ("Jackson

Aff") ¶ 5. Second, as a legal matter, CP contends that if it were going to escrow funds to pay for damages which the court might ultimately award in Essroc's favor, the amount would be nowhere near as large as that hoped for by Essroc:

> The amount that Essroc asserts should be escrowed—$418,823.76—is completely off-base. As [defense counsel] plainly stated in his February 26, 2008 letter, the amount that Defendants planned to escrow was to be "all Gross Receipts collected by [CP Recycling], *less the commission and expenses* provided for in the Agreement...." The $418,823.76 amount that Essroc asserts simply represents the entire gross receipts, without subtracting from that amount the monthly commission fee and expenses due to Defendant CPRIN, Inc. under the parties' agreement. Therefore, even if an amount of money were to be ordered escrowed by the Court, determining the proper amount—in the absence of a stipulation by the parties—would require an evidentiary hearing and factual finding by this Court. Essroc has not even submitted any affidavit or documentary evidence on this motion to establish the proper amount.

CP's Opp at 3 (emphasis in original, citation to record omitted); *see also* CP Opp, Ex A (Jackson Aff) ¶¶ 1–3.

## LEGAL STANDARD and DISCUSSION

■■■ To obtain preliminary injunctive relief, Essroc must show that it is being threatened with a legally cognizable irreparable injury for which there is no adequate legal remedy (such as monetary damages). *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir.2006) (citing *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (Thomas, J.)). In considering whether to enter a temporary restraining order, this court considers (1) whether Essroc has shown a substantial likelihood that it will prevail on the merits of its claims, (2) whether there is a threat of irreparable harm to Essroc if the injunction does not issue, (3) whether issuance of the injunction would substantially harm others, and (4) whether issuance of the injunction would serve the public interest. *See Hilliard v. Clark*, 2007 WL 2589956, *3 (W.D.Mich. Aug. 31, 2007) (Maloney, J.) (citing *Warshak v. US*, 490 F.3d 455, 465 (6th Cir.2007)).[1]

---

1. Two circuits hold that likely success on the merits is a *sine qua non* of injunctive relief. *See Am. Fed'n of Gov't Employees, AFL–CIO v. US*, 104 F.Supp.2d 58, 64 (D.D.C.2000) ("*AFGE*"); *Wine & Spirits Retailers, Inc. v. RI*, 418 F.3d 36, 46 (1st Cir.2005) ("The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become a matter of idle curiosity."). The rationale is that "[w]ithout such a substantial indication, 'there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.'" *AFGE*, 104 F.Supp.2d at 64 (quoting *Am. Bankers Ass'n v. NCUA*, 38 F.Supp.2d 114, 141 (D.D.C.1999) (quoting *Wash. Metro. Area Transit Commission v.*

*Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977))).

*Accord Champion Parts Rebuilders, Inc. v. Cormier Corp.*, 661 F.Supp. 825, 849 n. 52 (N.D.Ill.1987) ("[T]he merits inquiry may be viewed as the most critical. [A] failure on that score is immediately fatal to plaintiff.") (citing *O'Connor v. Bd. of Ed. of Sch. Dist. No. 23*, 645 F.2d 578, 580 (7th Cir.1981); *San Miguel v. DPW*, 2008 WL 541150, *5 (S.Ct. Guam Terr. Feb. 20, 2008).

Our Circuit has not yet expressly called the likelihood of success on the merits the *sine qua non* of preliminary injunctive relief. It has held, however, that it was not error to dispense with analysis of the other three factors where the movants made a weak showing on the merits:

> Because the district court found ... that the plaintiffs did not have a substantial like-

■ Essroc fails to even mention our Circuit's four-part test for the propriety of preliminary injunctive relief. As for the first factor, Essroc fails to cite *a single* Michigan decision—let alone binding decisions from the Michigan Supreme Court or the Michigan Court of Appeals—explaining the elements of its contract and tort causes of action and showing why it is likely to prevail on the merits of each of its claims. Even without the benefit of an answer or dispositive-motion briefs from the defendants, Essroc could easily anticipate at least some of the defendants' arguments against Essroc's claims, and perhaps their main argument. Essroc's own TRO brief attaches a February 26, 2008 letter wherein the defendants' counsel states the following legal position to Essroc:

On February 15, 2008, Essroc employees summarily, and without notice, prevented CP employees and contractors from performing any further services under the Agreement and informed them that the Agreement was terminated. . . .

Section 2 of the Agreement provides:

The term of this Agreement ("the Term") shall be for three (3) years commencing on January 1, 1994. It shall be automatically extended for an

additional one (1) year period provided that Essroc receives at least Eight Million Five Hundred Thousand Dollars ($8,500,000) from the Gross Receipts collected by CP for the calendar year 1994.

Except as provided in the preceding sentence, this Agreement shall also be automatically renewed for additional one (1) year periods ("Renewal Terms") unless either party at least ninety (90) days prior to the expiration of the Term or any Renewal Terms shall notify the other in writing that it wishes to terminate this Agreement. Following any such termination notice the parties shall use their best efforts to provide a smooth transfer to the successor HWDF supplier.

Because the Agreement is year-to-year and terminable only upon 90 days' written notice prior to the end of any particular year, Essroc's termination was in breach of the breach of the Agreement, which breach has caused our client significant damages. * * *

TRO Br, Ex F at 2–3 (second paragraph break added). Essroc's TRO brief makes no attempt to show why this court or a jury, applying Michigan law, would be like-

lihood of success on the merits ... [it] did not make findings on the record with respect to the remaining three factors to be considered when determining whether a preliminary injunction should issue. Since the district court apparently considered that the failure of the plaintiffs to show a likelihood of success on the merits was significant enough to prevent the injunction from issuing, the additional findings were not necessary. *See generally American Imaging Servs., Inc. v. Eagle–Picher Indus., Inc. (In re Eagle–Picher Indus., Inc.),* 963 F.2d 855, 862 (6th Cir.1992) (stating that the district court is not required to make findings on factors that are not dispositive with respect to the issuance of a preliminary injunction); 11A [Wright, Miller, and Kane], FEDERAL

PRACTICE & PROCEDURE § 2948.3, at 184–188 (2d ed. 1995) (noting that the plaintiff must generally show at least some probability of success on the merits in order to obtain a preliminary injunction). *Leary v. Daeschner,* 228 F.3d 729, 739 (6th Cir.2000) (¶ break added). *See also Jones v. City of Monroe,* 341 F.3d 474, 476 (6th Cir. 2003) ("[A] district court is not required to make specific findings concerning each of the four factors used [in federal courts] in determining a motion for preliminary injunction if fewer factors are dispositive of the issue."). For a recent summary of all the circuits' standards for preliminary injunctive relief, *see Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1363–66 (Fed.Cir.2008).

ly to conclude that the defendants, rather than Essroc, breached the parties' agreement.

The failure to show any likelihood of success on the merits—let alone a strong or substantial likelihood of success—is enough, by itself, to warrant denial of preliminary injunctive relief. *See Abney v. Amgen, Inc.,* 443 F.3d 540, 547 (6th Cir. 2006) ("a finding of no likelihood of success 'is usually fatal'") (quoting *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir.2000)).

■ As to the second factor of the test for preliminary injunctive relief, Essroc fails to even allege any harm that it will suffer, if a TRO and PI do not issue, that will not be reparable with an award of monetary damages following a victory on a dispositive motion or at trial. *See Overstreet v. Lexington–Fayette Urban Cty. Gov't,* 305 F.3d 566, 578 (6th Cir.2002) ("A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages.") (citing *Basiccomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir.1992)); *see, e.g., Zazueta v. Ky. Cmty. & Tech. Coll. Sys.,* 92 Fed.Appx. 298 (6th Cir.2004) (p.c.) (Batchelder, Gibbons, E.D. Mich. D.J. Avern Cohn) (in professor's employment-discrimination action against college and its officials, district court did not abuse discretion in denying professor's request for preliminary injunction because

she had an adequate remedy at law in the form of money damages if she prevailed).[2]

Even temporary unemployment or other *total* loss of income, remediable later by payment of money, is not irreparable harm for this purpose. *See Overstreet,* 305 F.3d at 579 (citing *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) ("the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury") and *Aluminum Workers Int'l Union, AFL–CIO, Local Union No. 215 v. Consol. Aluminum Corp.,* 696 F.2d 437, 444 (6th Cir.1982) (finding that employees did not suffer irreparable harm from unemployment pending arbitration) and *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.,* 59 F.3d 80, 83 (8th Cir.1995) ("[t]he loss of a job is quintessentially reparable by money damages")); *Jerome v. Viviano Food Co., Inc.,* 489 F.2d 965 (6th Cir.1974) (Title VII plaintiff who claimed that defendant refused to hire her because she was a woman was not entitled to a preliminary injunction, because an award of back wages could adequately compensate her later if she prevailed on her claim).

Even a company's substantial loss of market share or complete dissolution or bankruptcy does not constitute irreparable harm for this purpose, because it too can be compensated by money damages later. *See Southern Milk Sales, Inc. v. Martin,* 924 F.2d 98 (6th Cir.1991) (district court did not abuse discretion in denying agri-

---

**2.** For example, the loss of constitutional freedoms, the loss of privacy, damage to one's personal reputation, and the loss of a business's goodwill or fair competition have all been held to constitute irreparable harm that can warrant issuance of preliminary injunctive relief on an appropriate set of facts. *See, e.g., Plane v. US,* 750 F.Supp. 1358 (W.D.Mich.1990) (issuing preliminary injunction against Defense Logistic Agency's random urinalysis drug-testing program of

certain civilian employees, where testing infringed on employees' Fourth Amendment rights);

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Grall,* 836 F.Supp. 428 (W.D.Mich.1993) (Gibson, J.) (loss of goodwill and fair competition caused by breach of agreement not to disclose proprietary information, confidential information, or trade secrets) (citing *Basicomputer,* 973 F.2d at 509 and 512).

cultural cooperative's motion for PI, notwithstanding cooperative's allegation that the defendants' continued contractual breaches "will lead to a decline in confidence in the cooperative" and, in turn, "difficulty in acquiring milk, loss of customers, and ultimately ... the dissolution of the cooperative"); *United Food & Commercial Workers Union, Local No. 626 v. Kroger Co.*, 778 F.2d 1171 (6th Cir.1985) (district court did not abuse discretion in denying union's motion for PI prohibiting sale of stores pending arbitration, because arbitrator could award back-pay and damages if it found that company breached contract, and company would suffer substantial harm if injunction were erroneously granted unless union posted very large bond); *Eberspaecher North Am., Inc. v. Van–Rob, Inc.*, 544 F.Supp.2d 592 (E.D.Mich.2008) (manufacturer of automotive exhaust system products would not suffer irreparable harm if it were required to pay price increases that defendant muffler supplier alleged were due under requirements contract, notwithstanding plaintiff's allegations that it could not obtain mufflers from any other source, it would incur millions of dollars in penalties from automobile manufacturer, and it would have to close its doors).

In any event, Essroc has not even alleged that it runs a real risk of dissolution, bankruptcy, or even substantial curtailment of operations if the court declines to require the defendants to place funds in trust for future payment of possible contract and tort damages—let alone provided credible evidence of such a risk. *Cf. Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 802–03 (3d Cir.1989) (district court abused discretion in issuing preliminary injunction requiring defendant to continue contract, as plaintiff failed to present sufficient evidence that termination of contract would force plaintiff to shut down or declare bankruptcy); *contrast Pascarell v. N.Y. Shipping Ass'n, Inc.*, 650 F.2d 19 (3d Cir.1981) (district court properly enjoined implementation of "Rules on Containers" in collective bargaining agreement union and defendant shipping association pending final NLRB determination of whether rules violated federal labor law, as charges were not frivolous and implementation of rules could have put freight consolidators out of business before NLRB had time to determine whether rules were illegal); *B & D Land & Livestock Co. v. Conner*, 534 F.Supp.2d 891 (N.D.Iowa 2008) (corporate producer showed credible threat of irreparable harm if court did not preliminarily enjoin USDA conversion of wetlands under "Swampbuster" Act, as denial of present benefits or collection of past benefits would have forced producer into bankruptcy, and damages were not adequate remedy for producer's loss of ability to continue its farming operations).

The failure to show irreparable harm, by itself, can justify the denial of preliminary injunctive relief without consideration of the other three factors. *See Hacker v. Federal BOP*, 2006 WL 2559792, *8 (E.D.Mich. Sept. 1, 2006) (Lawson, J.) ("The failure to demonstrate irreparable harm is fatal to the petitioner's request for a preliminary injunction. Therefore, the Court need not evaluate the other factors.").

In light of Essroc's weak to non-existent showing on the first factor (likelihood of success on the merits) and the second factor (irreparable harm absent a preliminary injunction)—either of which alone justifies denial of the preliminary injunction—the court need not consider the third and fourth factors (harm to others if the preliminary injunction issues, and the public interest). *See Edwards v. Burnett*, 2006 WL 1983236, *2 (E.D.Mich. July 12, 2006) (Paul Borman, J.) ("Given the impossibility

of Plaintiff's success on the merits, and the lack of showing of irreparable harm, it is not necessary to discuss the other two factors—substantial harm to others and the public interest.").

■ Finally, in addition to Essroc's failure to satisfy the four-part test for preliminary injunctive relief, the court agrees with CP that Essroc is essentially seeking security for a potential future award of money damages, and Essroc has not cited any authority permitting this court to do so. Essroc cites no authority holding that the feared inability to collect a prospective judgment is an adequate basis for preliminary injunctive relief. On the contrary, it appears that Essroc is merely an unsecured creditor of CP, and "an unsecured creditor has no rights at law or in equity in the property of his debtor." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund,* 527 U.S. 308, 330, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999), *followed by Elliott Bros. Steel Co. v. Michigan Metals, Inc.,* 2008 WL 2697287, *2 (E.D.Mich. July 2, 2008); *see also State of Michigan v. Little River Band of Ottawa Indians,* 2006 WL 2092415, *5 (W.D.Mich. July 26, 2006) (Wendell Miles, J.) ("Plaintiff concede there is no fraud or misrepresentation involved in this case, but argue that it would be inequitable for Defendants to retain full legal title to the funds in the accounts because it is actually money that should have been paid to the Plaintiffs. However, until Plaintiffs obtain a ruling in their favor establishing the Defendants owe them the amount of money in the accounts, it is not just unconscionable or unjust for [Defendants] to retain control over the money.").

There are exceptions to this rule, but Essroc has not attempted to show that any of the exceptions applies here. *See Grupo Mexicano,* 527 U.S. at 324–28, 119 S.Ct. 1961 (an unsecured creditor may seek preliminary injunctive relief where a statute specifically authorizes such relief, such as the bankruptcy, tax, or securities laws, or where the complaint seeks equitable relief such as restitution or rescission of a contract).

In essence, Essroc "is asking this Court to ignore over 200 years of American jurisprudence prohibiting the equitable relief of freezing a party's 'unencumbered assets . . . before their claims have been vindicated by judgment.'" *RBS Asset Finance, Inc. v. Bravo,* 2005 WL 3008581, *2 (E.D.Mich. Nov. 9, 2005) (citing *Adler v. Fenton,* 65 U.S. 407, 24 How. 407, 16 L.Ed. 696 (1861), and *Grupo Mexicano,* 527 U.S. 308, 119 S.Ct. 1961). This the court will not do.

### ORDER

Plaintiff Essroc Cement Corporation's application for a temporary restraining order and/or a preliminary injunction [document # 3] is **DENIED.**

Clerk's Office docket records indicate that all four defendants were served with a summons and a copy of the complaint on Saturday, October 25, 2008. The defendants **SHALL FILE** answers or other appropriate responses to the complaint in accordance with the Federal Rules of Civil Procedure and the Local Civil Rules of this court.

This is *not* a final order. "It is well established that '[a]n order granting, denying, or dissolving a temporary restraining order is generally not appealable.'" *Workman v. Bredesen,* 486 F.3d 896, 922 (6th Cir.) (Sutton, J.) (quoting MOORE'S FEDERAL PRACTICE § 65.41 (3d ed. 2005)), *cert. denied,* —— U.S. ——, 127 S.Ct. 2160, 167 L.Ed.2d 887 (2007).